UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
INDIAN CAPITOL DISTRIBUTING, INC.
    Debtor.                                    No. 09-11558-s7

CRAIG H. DILL, Chapter 11 Trustee,
    Plaintiff,
v.                                              Adv. No. 10-1180 S

BRAD HALL & ASSOCIATES, INC.,
    Defendant.

### MEMORANDUM OPINION GRANTING DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Brad Hall &
Associates, Inc.'s ("Brad Hall") Motion for Summary Judgment[1]
(doc 4) with Accompanying Brief in Support (doc 5) and the
Affidavit of Logan B. Hall. Doc 6. Craig H. Dill, chapter 7
Trustee ("Dill" or "Plaintiff") filed a Response (doc 7), and
Brad Hill filed a Reply. Doc 10. This adversary proceeding
seeks to avoid a postpetition transfer under 11 U.S.C. § 549 and
to recover it for the benefit of the estate under 11 U.S.C. §
550. For the reasons set forth below, the Defendant's Motion
will be granted, albeit on grounds not argued by the parties, and
this adversary case will be dismissed without prejudice to

---

[1] The Motion actually is captioned as a Motion to Dismiss
for Failure to State a Claim, but was accompanied by an
affidavit. At the initial pretrial conference, the parties
discussed converting the Motion to one for summary judgment, and
the Order Resulting from Initial Pretrial Conference ordered that
the Motion would be treated as one for summary judgment under
Rule 56. Doc 9.

refiling in the event that the Trustee can show that the estate has suffered a loss.[2]

**BACKGROUND[3]**

Indian Capitol Distributing, Inc. ("Indian Capitol" or "Debtor") began its very short life as a debtor-in-possession chapter 11 case when it filed a voluntary Chapter 11 petition on April 14, 2009. On April 15, 2009, Debtor filed an Emergency Motion to Use Cash Collateral for an interim period (doc 5) in which it alleged, in part:

> Debtor operates a oil sales and distributing business, generally consisting of a bulk sales operation and a number of retail gas stations and "convenience stores." Additionally, Debtor's principal is the part-owner and chief executive officer of another New Mexico corporation, Mataya's Travel Plaza, Inc., which operates a separate "travel plaza" selling, among other things, gasoline products it purchases from the Debtor. The travel plaza is in the process of paying back a substantial account receivable to the Debtor, and its ability to do so will likely depend on the Debtor's continued operations. In the course of such business operations, Debtor will incur various expenses in the ordinary course of business and expenses of this proceeding which must be paid in order to continue operations and in order to maintain and protect assets of the estate. If Debtor is unable to pay various operating expenses, even for a short period of time, it will not be able to continue its operations. Upon any cessation of operations, the

---

[2] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A)and (E); and these are findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P.

[3] The Court is not finding facts in this section of the memorandum, only taking notice of the file and providing context.

Case 10-01180-s    Doc 13    Filed 10/05/11    Entered 10/05/11 09:59:39 Page 2 of 32

"going concern" value of the business will be lost.
Further, if such "going concern" value is lost or
impaired, the marketability of the business, components
of the business, and assets will also be impaired.  In
this regard, the Debtor has reason to believe that
third parties may be interested in acquiring Debtor's
assets and operations, and any possibility of selling
such assets and operations will depend, at least in
part, on the going concern value of the assets and
continuation of operations.

On April 16, 2009, the various parties submitted a
stipulated order authorizing use of cash collateral and granting
adequate protection for an interim budget period, pending a final
hearing on the Emergency Cash Collateral Motion.  Doc 10.  The
final hearing was set for May 5, 2009.  Doc 19.  Debtor then
filed its First [sic] Motion for Use of Cash Collateral (doc 25),
seeking to use cash collateral through November 7, 2009.  It
contained virtually the same representations regarding the need
for cash collateral as the Emergency Motion.  Debtor then filed a
Second Emergency Motion to use cash collateral on April 30, 2009.
Doc 32.

At the May 5, 2009 hearing, the Court took under advisement
the Emergency Motion to Use Cash Collateral and set a final
hearing on the First Motion to Use Cash Collateral for May 18,
2009.  (Minutes, doc 45).  On May 12, 2009, the Court conducted a
further hearing on cash collateral issues and orally granted
interim use pending further order of the Court.  (Amended
Minutes, doc 54).  The oral ruling was memorialized by an Order
entered May 18, 2009.  Doc 61.  Also on May 18, 2009, the Court

Case 10-01180-s   Doc 13   Filed 10/05/11   Entered 10/05/11 09:59:39 Page 3 of 32

conducted the final hearing on the First Motion to use cash collateral and took the First Motion under advisement. (Minutes, doc 63). On May 22, 2009, the Court conducted a hearing and orally denied further use of cash collateral. (Minutes, doc 66). On May 28, 2009 the Court conducted yet another hearing on cash collateral and denied use of cash collateral pending further order of the Court. (Minutes, doc 67). The Court entered an Order Prohibiting Use of Any Cash Collateral on May 29, 2009. Doc 68. The Court entered an order appointing Dill as Chapter 11 trustee on June 17 (doc 98), and he continued as the Chapter 7 trustee when the case converted to Chapter 7 on March 31, 2010. Doc 318.

In summary, Debtor filed bankruptcy on April 14, 2009 and promptly filed for permission to use cash collateral. The Court authorized the use of cash collateral, as conditioned in various orders, through May 22, 2009. Permission ended on May 22, 2009 and was never reinstituted.

This adversary proceeding alleges that Debtor purchased petroleum products from Brad Hall from May 24, 2009 to May 28, 2009, in the amount of $97,860.01 and that Brad Hall received payment of that amount from Debtor (as Debtor-in-Possession) in three payments made on May 26, 2009, June 1, 2009, and June 11, 2009. Dill seeks the return of these funds as unauthorized postpetition transfers prohibited by 11 U.S.C. § 549.

## SUMMARY JUDGMENT

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Bankruptcy Rule 7056(a)[4].  In

---

[4] Bankruptcy Rule 7056 incorporates Fed.R.Civ.P. 56.  That Rule provides, in part:
(a) Motion for Summary Judgment or Partial Summary Judgment.  A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
...
(c) Procedures.
(1) Supporting Factual Positions.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
(2) Objection That a Fact Is Not Supported by Admissible evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
(3) Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.
(4) Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or
(continued...)

Case 10-01180-s   Doc 13   Filed 10/05/11   Entered 10/05/11 09:59:39 Page 5 of 32

determining the facts for summary judgment purposes, the Court

may rely on affidavits made with personal knowledge that set

forth specific facts otherwise admissible in evidence and sworn

or certified copies of papers attached to the affidavits.

Fed.R.Civ.P. 56(c)(1).  When a motion for summary judgment is

made and supported by affidavits or other evidence, an adverse

party may not rest upon mere allegations or denials.  <u>Id.</u>

Rather, "Rule 56(e) ... requires the nonmoving party to go

beyond the pleadings and by her own affidavits, or by the

'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine

issue for trial.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324

(1986).  "Rule 56(e) permits a proper summary judgment motion to

be opposed by any of the kinds of evidentiary materials listed in

Rule 56(c), except the mere pleadings themselves."  <u>Id.</u>  The

_____

[4](...continued)
declarant is competent to testify on the matters
stated.
...
(e) Failing to Properly Support or Address a Fact.  If
a party fails to properly support an assertion of fact
or fails to properly address another party's assertion
of fact as required by Rule 56(c), the court may:
(1) give an opportunity to properly support or address
the fact;
(2) consider the fact undisputed for purposes of the
motion;
(3) grant summary judgment if the motion and supporting
materials--including the facts considered
undisputed--show that the movant is entitled to it; or
(4) issue any other appropriate order.

court does not try the case on competing affidavits or depositions; the court's function is only to determine if there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In ruling on a motion for summary judgment, the trial court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party.  Mountain Highlands, LLC v. Hendricks, 616 F.3d 1167, 1169-70 (10th Cir. 2010)(citing Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005)).  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment."  Id. at 1170 (quoting Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)) (internal quotation marks omitted).  "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)(citing Celotex, 477 U.S. at 322-23).  "[F]ailure of proof of an essential element renders all other facts immaterial."  Mountain Highlands, 616 F.3d at 1170

Case 10-01180-s   Doc 13   Filed 10/05/11   Entered 10/05/11 09:59:39 Page 7 of 32

(quoting <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d 1202, 1212 (10th Cir.), <u>cert. denied</u>, 531 U.S. 926 (2000)).

New Mexico LBR 7056-1 governs summary judgment motions. It provides, in part:

> The memorandum in support of the motion shall set out as its opening a concise statement of all of the material facts as to which movant contends no genuine issue exists. The facts shall be numbered and shall refer with particularity to those portions of the record upon which movant relies.

> A memorandum in opposition to the motion shall contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and shall state the number of the movant's fact that is disputed. All material facts set forth in movant's statement that are properly supported shall be deemed admitted unless specifically controverted.

**FACTS**

Defendant's Brief (doc 5) contains a statement of 34 undisputed material facts. Plaintiff's response, doc 7, p. 6, disputes only Defendant's fact 8. That fact states: "From April 14, 2009 until a Trustee was appointed in its Chapter 11 case, Indian Capitol continued to purchase some petroleum products from Hall on a COD basis." Plaintiff argues that this fact is inconsistent with Defendant's fact 26 which suggests the last fuel was purchased from Brad Hall on May 28, 2009. Defendant concedes that the last purchase was May 28, 2009. (Reply, doc 10, p. 13.) Otherwise, Plaintiff claims that all of Defendants

Page -8-

other facts are not relevant or material to the case or its legal theory. (Response, doc 7, p. 6). However, NM LBR 7056-1 is clear: "All material facts set forth in movant's statement that are properly supported shall be deemed admitted unless specifically controverted." Therefore, the Court will adopt Defendant's statement of facts, with modified fact 8, as follows:

1.    On or about December 5, 2006 Indian Capitol Distributing, Inc. began purchasing petroleum products from Brad Hall & Associates, Inc.

2.    In order to implement the agreement between the parties, Hall provided Indian Capitol with its account number and PIN number at terminals in Gallup, and elsewhere, operated by Giant Western Refining, and others, and Indian Capitol used those account numbers and PIN numbers to load its trucks with petroleum products at terminals in Gallup and elsewhere (the "Terminals").

3.    On April 14, 2009 Indian Capitol filed a Chapter 11 Petition in bankruptcy.

4.    On April 16, 2009 this Court entered its Stipulated Emergency Order Authorizing Use of Cash Collateral And Granting Adequate Protection (Doc. 10) (the "Emergency Order").

5.    Paragraph 7 of the Emergency Order indicates that as and for adequate protection for the Debtor's use of the cash collateral of the Bank of Albuquerque, the Bank was provided with a continuing security interest in all assets of the Debtor in which

Case 10-01180-s    Doc 13    Filed 10/05/11    Entered 10/05/11 09:59:39 Page 9 of 32

it had a lien as of the Petition Date, and in addition said Order granted the Bank a replacement lien against the property of the Debtor of the same type as the Bank's prepetition collateral acquired by the Debtor Post-Petition.

6.    The Proof Of Claim filed by the Bank of Albuquerque indicates that the loan from said Bank to the Debtor is secured by all inventory, accounts, equipment, and trade fixtures of the Debtor, and proceeds thereof (Claim 19-1 filed September 16, 2009).

7.    The Court Docket does not indicate that Hall or any other trade creditor was mailed copies of the Emergency Order, or otherwise specifically given notice of the entry of said Order.

8.    From April 14, 2009 until May 28, 2009, Indian Capitol continued to purchase some petroleum products from Hall on a COD basis.

9.    According to the Trustee's Complaint filed in Adversary Number 10-01181, Indian Capitol also continued to purchase petroleum products from Conoco Phillips Company.

10.   Sometime after April 23, 2009 Hall was provided by regular mail with notice of the Debtor's First Motion For Use Of Cash Collateral (Doc. 25)(the "Cash Collateral Motion"), including notice of a hearing on the Cash Collateral Motion to be held on May 5, 2009.

11.  Hall had no reason to object to the Cash Collateral Motion, and Hall had no reason to have its attorneys attend the May 5, 2009 hearing or any other hearing involving cash collateral.

12.  The Court Docket reflects that cash collateral hearings were held on May 5, 18, 22, and 28, 2009. Hall did not have its attorneys attend any cash collateral hearings.

13.  Hall had no specific notice of the hearings held on May 18, 22, and 28, 2009, and Hall had no reason to have its attorneys attend said hearings.

14.  On May 18, 2009 this Court entered its Order Authorizing Debtor To Use Cash Collateral On Interim Basis (Doc. 61)(the "Interim Order").

15.  The Interim Order authorized the Debtor to use up to $300,000 of cash collateral for the purchase of inventory, $12,000 to pay utility charges and insurance premiums, and $38,000 for payroll and applicable taxes.

16.  The Interim Order did not specify how much of the $300,000 for the purchase of inventory was for petroleum products as opposed to other types of inventory (such as food and dry goods) sold at the gasoline stations operated by Indian Capitol.

17.  The Interim Order did not enjoin Hall or any other trade creditor. Further, copies of the Interim Order were not specifically sent to Hall or any other trade creditor.

18. From May 24, 2009 through May 28, 2009 Indian Capitol used Hall's account numbers and PIN numbers in Gallup and elsewhere to load its trucks with petroleum products at various Terminals, and thereby purchase petroleum products, as detailed below.

19. On May 24, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $11,585.85 worth of premium and unleaded fuel from Hall. Attached as Exhibit A to the Affidavit is a copy of Hall's Invoice # 11040349 for said fuel, the related bill of Lading, and Hall's supplier invoices.

20. On May 24, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $9,208 worth of clear and unleaded fuel from Hall. Attached as Exhibit B to the Affidavit is a copy of Hall's Invoice # 11040350 for said fuel, the related bill of Lading, and Hall's supplier invoice.

21. Hall received payment in the amount of $20,793.85 on Invoices # 11040349 and 11040350 on May 26, 2009.

22. On May 26, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $19,470.33 worth of clear and unleaded fuel from Hall. Attached as Exhibit C to the Affidavit is a copy of Hall's Invoice # 11041006 for said fuel, the related bill of Lading, and Hall's supplier invoices.

Case 10-01180-s   Doc 13   Filed 10/05/11   Entered 10/05/11 09:59:39 Page 12 of 32

23.  On May 26, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $21,212.11 worth of premium and unleaded fuel from Hall.  Attached as Exhibit D to the Affidavit is a copy of Hall's Invoice # 11041007 for said fuel, the related bill of Lading, and Hall's supplier invoices.

24.  On May 27, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $20,583.04 worth of premium, clear-ULSD, and unleaded fuel from Hall. Attached as Exhibit E to the Affidavit is a copy of Hall's Invoice # 11041276 for said fuel, the related bill of Lading, and Hall's supplier invoices.

25.  On May 28, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $5,237.83 worth of DYED-ULSD from Hall.  Attached as Exhibit F to the Affidavit is a copy of Hall's Invoice # 11041554 for said petroleum products, the related bill of Lading, and Hall's supplier invoice.

26.  On May 28, 2009 Indian Capitol loaded one or more trucks with petroleum products at a Terminal and purchased $10,562.85 worth of clear-ULSD fuel from Hall.  Attached as Exhibit G to the Affidavit is a copy of Hall's Invoice # 11041553 for said fuel, the related bill of Lading, and Hall's supplier invoices.

27.  Hall received payment in the amount of $41,795.15 on Invoices # 11041007 and 11041276 on June 1, 2009.

28.  Hall received payment in the amount of $35,271.01 on Invoices # 11041006, 11041554, and 11041553 on June 11, 2009.

29.  As summarized above, in exchange for the above described post-petition purchases of petroleum products from Hall, Indian Capitol paid Hall the sum of $97,860.01.

30.  $97,860.01 was the reasonably equivalent value of the petroleum products supplied Post-Petition to Indian Capitol by Hall between May 24 and May 28, 2009.

31.  All of the above described petroleum products purchased by Indian Capitol from Hall were loaded onto Indian Capitol trucks by Indian Capitol truck drivers, and received by Indian Capitol between May 24 and May 28, 2009, inclusive.

32.  At the time the above-described petroleum products were purchased from Hall by Indian Capitol, Hall had no reasonable way of knowing whether the Debtor had exceeded or was about to exceed the cash collateral authority provided to the Debtor in the Interim Order.

33.  The Order Prohibiting Use Of Cash Collateral (Doc 68) (the "Prohibition Order") was entered on the docket May 29, 2009, subsequent to the time the above described petroleum products were loaded onto Indian Capitol trucks by Indian Capitol truck

drivers, received by Indian Capitol, and sold to Indian Capitol between May 24 and May 28, 2009.

34.  The Prohibition Order did not enjoin Hall or any other trade creditor. Further, copies of the Prohibition Order were not specifically sent to Hall or any other trade creditor.

## DISCUSSION

Federal courts' jurisdiction is strictly limited by Article III, § 2, of the Constitution to "Cases" and "Controversies." Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 102 (1998).  The Supreme Court describes cases and controversies as those matters amenable to and resolvable by the judicial process.  Id. (citing Muskrat v. United States, 219 U.S. 346, 356-57 (1911)).  "Standing to sue is part of the common understanding of what it takes to make a justiciable case."  Id. (citing Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, see [Allen v. Wright, 468 U.S. 737 (1984)], at 756, 104 S.Ct., at 3327; Warth v. Seldin, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); Sierra Club v. Morton, 405 U.S. 727, 740-741, n. 16, 92 S.Ct. 1361, 1368-1369, n. 16, 31 L.Ed.2d 636 (1972);[n1] and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " Whitmore [v. Arkansas, 495 U.S. 149 (1990)], at 155, 110 S.Ct., at 1723 (quoting Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)).  Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the

defendant, and not ... th[e] result [of] the
independent action of some third party not before the
court." <u>Simon v. Eastern Ky. Welfare Rights
Organization</u>, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926,
48 L.Ed.2d 450 (1976). Third, it must be "likely," as
opposed to merely "speculative," that the injury will
be "redressed by a favorable decision." <u>Id.</u>, at 38,
43, 96 S.Ct., at 1924, 1926.

[n1] By particularized, we mean that the injury must
affect the plaintiff in a personal and individual way.

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).

"This triad of injury in fact, causation, and redressability—

constitutes the core of Article III's case or controversy

requirement, and the party invoking federal jurisdiction bears

the burden of establishing its existence." <u>Steel Company</u>, 523

U.S. at 103-04 (citing <u>FW/PBS, Inc. v. Dallas</u>, 493 U.S. 215, 231

(1990)(Footnote omitted.) <u>See also Valley Forge Christian</u>

<u>College v. Americans United for Separation of Church and State,</u>

<u>Inc.</u>, 454 U.S. 464, 472 (1982):

[A]t an irreducible minimum, Art. III requires the
party who invokes the court's authority to "show that
he personally has suffered some actual or threatened
injury as a result of the putatively illegal conduct of
the defendant," <u>Gladstone, Realtors v. Village of
Bellwood</u>, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60
L.Ed.2d 66 (1979), and that the injury "fairly can be
traced to the challenged action" and "is likely to be
redressed by a favorable decision," <u>Simon v. Eastern
Kentucky Welfare Rights Org.</u>, 426 U.S. 26, 38, 41, 96
S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).[N9]  In
this manner does Art. III limit the federal judicial
power "to those disputes which confine federal courts
to a role consistent with a system of separated powers
and which are traditionally thought to be capable of
resolution through the judicial process." <u>Flast v.
Cohen</u>, 392 U.S. [83 (1968)], at 97, 88 S.Ct., at 1951.

Page -16-

[N9] See Watt v. Energy Action Educational Foundation,
454 U.S. 151, 161, 102 S.Ct. 205, 212, 70 L.Ed.2d 309
(1981); Duke Power Co. v. Carolina Environmental Study
Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57
L.Ed.2d 595 (1978); Arlington Heights v. Metropolitan
Housing Dev. Corp., 429 U.S. 252, 261, 262, 97 S.Ct.
555, 561, 50 L.Ed.2d 450 (1977); Warth v. Seldin, 422
U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343
(1975); Schlesinger v. Reservists Committee to Stop the
War, 418 U.S. 208, 218, 220–221, 94 S.Ct. 2925, 2930,
2931–2932, 41 L.Ed.2d 706 (1974); United States v.
Richardson, 418 U.S. 166, 179–180, 94 S.Ct. 2940,
2947–2948, 41 L.Ed.2d 678 (1974); O'Shea v. Littleton,
414 U.S. 488, 493, 94 S.Ct. 669, 674, 38 L.Ed.2d 674
(1974); Linda R.S. v. Richard D., 410 U.S. 614,
617–618, 93 S.Ct. 1146, 1148–1149, 35 L.Ed.2d 536
(1973).

The Valley Forge case emphasizes that the plaintiff must

have an "actual injury redressable by the court." Id.

It tends to assure that the legal questions presented
to the court will be resolved, not in the rarified
atmosphere of a debating society, but in a concrete
factual context conducive to a realistic appreciation
of the consequences of judicial action.  The "standing"
requirement serves other purposes.  Because it assures
an actual factual setting in which the litigant asserts
a claim of injury in fact, a court may decide the case
with some confidence that its decision will not pave
the way for lawsuits which have some, but not all, of
the facts of the case actually decided by the court.
     The Art. III aspect of standing also reflects a
due regard for the autonomy of those persons likely to
be most directly affected by a judicial order.  The
federal courts have abjured appeals to their authority
which would convert the judicial process into "no more
than a vehicle for the vindication of the value
interests of concerned bystanders." United States v.
SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37
L.Ed.2d 254 (1973).  Were the federal courts merely
publicly funded forums for the ventilation of public
grievances or the refinement of jurisprudential
understanding, the concept of "standing" would be quite
unnecessary.  But the "cases and controversies"
language of Art. III forecloses the conversion of
courts of the United States into judicial versions of

Page -17-

college debating forums.  As we said in <u>Sierra Club v.
Morton</u>, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31
L.Ed.2d 636 (1972):

> The requirement that a party seeking review must
> allege facts showing that he is himself adversely
> affected ... does serve as at least a rough
> attempt to put the decision as to whether review
> will be sought in the hands of those who have a
> direct stake in the outcome.
> The exercise of judicial power, which can so
> profoundly affect the lives, liberty, and property of
> those to whom it extends, is therefore restricted to
> litigants who can show "injury in fact" resulting from
> the action which they seek to have the court
> adjudicate.

<u>Id.</u> at 472-73.

Congress can pass statutes that grant certain rights to
persons, <u>e.g.,</u> 11 U.S.C. § 549 (empowering a bankruptcy trustee
to recover unauthorized postpetition transfers).  But Congress
may not "abrogate the Art. III minima." <u>Gladstone Realtors v.
Village of Bellwood</u>, 441 U.S. 91, 100 (1979).  Even a plaintiff
that relies on a statute must always have suffered a distinct and
palpable injury to himself that is likely to be redressed if the
requested relief is granted.  <u>Id.</u> (citations omitted.) <u>See also
Raines v. Byrd</u>, 521 U.S. 811, 820 n.3 (1997)("It is settled that
Congress cannot erase Article III's standing requirements by
statutorily granting the right to sue to a plaintiff who would
not otherwise have standing.")(Citation omitted.); <u>Warth v.
Seldin</u>, 422 U.S. at 501 ("Moreover, Congress may grant an express
right of action to persons who otherwise would be barred by
prudential standing rules. Of course, Art. III' s requirement

Case 10-01180-s    Doc 13    Filed 10/05/11    Entered 10/05/11 09:59:39 Page 18 of 32

remains: the plaintiff still must allege a distinct and palpable injury to himself[.]"); <u>O'Shea v. Littleton</u>, 414 U.S. 488, 493 n.2 (1974):

> We have previously noted that 'Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute. <u>See, e.g.</u>, <u>Trafficante v. Metropolitan Life Ins. Co.</u>, 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J., concurring); <u>Hardin v. Kentucky Utilities Co.</u>, 390 U.S. 1, 6, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).' <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). ... Perforce, the constitutional requirement of an actual case or controversy remains. Respondents still must show actual or threatened injury of some kind to establish standing in the constitutional sense.

There is no question that the limits imposed by Article III on federal jurisdiction apply equally in bankruptcy. <u>Illinois Investment Trust No. 92-7163 v. Allied Waste Industries, Inc. (In re Resource Technology Corp.)</u>, 624 F.3d 376, 382 (7th Cir. 2010); <u>In re Saffold</u>, 373 B.R. 39, 44 (Bankr. N.D. Ohio 2007).

And, finally, the Bankruptcy Court has a duty to raise jurisdiction <u>sua sponte</u> before reaching the merits of a case. <u>GAF Holdings, LLC v. Rinaldi (In re Farmland Industries, Inc.)</u>, 639 F.3d 402, 405 (8th Cir. 2011); <u>Day v. Klinger (In re Klinger)</u>, 301 B.R. 519, 523 n.5 (Bankr. N.D. Ill. 2003); <u>see</u> F.R.B.P. 7012, incorporating F.R.Civ.P. 12(h)(3).

In this adversary proceeding, Dill seeks the return of $97,860.01 solely because the payment was not authorized. The undisputed material facts show, however, that the $97,860.01

transferred to Brad Hall was for payment of gasoline Brad Hall delivered to the Debtor postpetition, and that the $97,860.01 was the reasonably equivalent value of the gasoline delivered to the estate.  Undisputed Material Fact No. 30.

The secured creditor had a lien on both cash and inventory, including the proceeds of the sale of the inventory.  Undisputed Material Facts Nos. 5, 6.  From the secured creditor's perspective, the value of its collateral was unchanged by the payments, so it was not damaged.  To be sure, the composition of its collateral was changed, converting some of its cash to a commodity which, regardless of its liquidity (no pun intended), is still not the equivalent of cash as such.[5]  But the Bank has filed no request for payment of an administrative claim which it would be entitled to had it suffered a loss not covered by its postpetition collateral.

From the estate's perspective, instead of $97,860.01 in cash, it had that amount of gasoline to sell.  Of course, had the Trustee taken over the case on May 29, he would probably would not have paid for the gasoline immediately.  Instead he would have retained the cash in the DIP account.  But he would have been faced with a request for payment of an administrative expense from Brad Hall, much as the Trustee is currently faced

_____

[5] Not that it matters, but it is almost certainly the case that the gasoline was sold and thereby converted back into cash subject to the Bank's lien.

Page -20-

with such a request from Navajo Nation Oil & Gas Company. Main
Case, doc 241, attached as exhibit 1 (doc 7-1) to Plaintiff's
Response to Motion to Dismiss for Failure to State a Claim. Doc
7. He would have had to pay that claim (perhaps even with unused
cash collateral). There would have been a delay in making that
payment, but the loss of any benefit the Trustee gets from
delaying payment of an administrative claim cannot be counted as
a legitimate harm to the estate. An administrative claim is not
paid immediately only because it needs to be verified as owed in
the amount requested and because the Trustee needs to assure
himself that there will be adequate funds to pay all the
administrative claims in full. Thus, the fact that the Trustee
took the case over after the bill had been paid rather than
before does not constitute a harm or loss to the estate; to hold
otherwise would provide an incentive to the Trustee not to
promptly pay the estate's bills.

To be clear as well, it might be that even if the Bank
suffered a loss on the transaction (that is, the Debtor or the
Trustee did not convert the gasoline back into the full amount of
the cash), it would cover that loss with other postpetition
collateral it was granted. This could result in fewer assets for
the estate once the secured creditor was paid in full. And that
probably would constitute an injury to the estate. But the
Trustee has not alleged any such loss.

One injury did result from the Debtor's disobedience of the orders that prohibited using cash collateral. That injury was to the integrity of the judicial process, courts and bankruptcy law system. Compare Davis v. Eagle Legacy Credit Union (In re Davis), 430 B.R. 902, 907 (Bankr. D. Colo. 2010)(Court dismissed debtor's adversary proceeding against creditor based on creditor's violation of bankruptcy rule requiring redaction of sensitive personal information. The Court found that to the extent that Defendant's "blatant disrespect" for the Court and its rules caused any harm, the harm was to the Court, not the plaintiff. Therefore, the plaintiff lacked standing.[6]) The Court assumes without deciding that would be a cognizable injury[7], and would justify a request by the Bank or the Trustee

---

[6] The Davis court also found that debtors/plaintiffs in that case could not prove that they had been damaged by the credit union's attaching to its proof of claim documents showing at least one plaintiff's full Social Security number, driver's license number, and date of birth, and denied standing on that basis. This Court is not citing the Davis case for that proposition. This Court does not necessarily agree that such an unwarranted disclosure of a debtor's personal identifying information is not redressable by a court at the request of a debtor.

   [7]But compare Steel Co., 523 U.S. at 107:
   By the mere bringing of his suit, every plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not
                                                    (continued...)

for sanctions against the Debtor.  However, suing Brad Hall does not address the Bank's or Trustee's potential injury.  Brad Hall did not violate the cash collateral order.  Brad Hall did not damage the secured creditor or the estate.  There are no allegations of collusion or bad faith or inequity.  Punishing Brad Hall would not resolve the injury caused by the Debtor's contemptuous behavior, nor would it have an impact of preventing future debtors from misusing cash collateral.[8]

Plaintiff relies heavily on <u>Marathon Petroleum Co. v. Cohen (In re Delco Oil, Inc.)</u>, 599 F.3d 1255 (11th Cir. 2010), the facts of which are almost identical to those in this case.[9]  But

---

[7](...continued)
redress a cognizable Article III injury.  <u>See, e.g.</u>, <u>Allen v. Wright</u>, 468 U.S. 737, 754-755, 104 S.Ct. 3315, 3326-3327, 82 L.Ed.2d 556 (1984); <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 482-483, 102 S.Ct. 752, 763-765, 70 L.Ed.2d 700 (1982).  Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.
(Emphasis in original.)

[8] In fact, granting the relief requested would encourage future debtors to disobey cash collateral orders as an easy way to defraud future chapter 11 vendors and end up with money in the estate.

[9] This Court cited <u>Delco</u> in <u>Gonzales v. Beery (In re Beery)</u>, 452 B.R. 825, 833 (Bankr. D. N.M. 2011) as an "appropriate use of § 549 by the trustee".  <u>Beery</u> was an adversary proceeding in which a chapter 7 debtor (thus a debtor out of possession) purported to transfer estate property.  The chapter 7 trustee filed an action to declare that the attempted transfer was void pursuant to §362(a)(3), and the recipient defendants argued that
(continued...)

Page  -23-

with respect to the Eleventh Circuit (and particularly to the learned author of the opinion), this Court finds that <u>Delco</u> is not persuasive.

In <u>Delco</u>, the debtor in possession improperly spent almost $2,000,000 of cash collateral purchasing product from Marathon Oil. Shortly thereafter the case converted to chapter 7 and the trustee brought a §549 action against Marathon to recover the postpetition payments. There was no question that Marathon had supplied the product, and the opinion contains no suggestion that the product was not worth what the debtor in possession paid for it. The court began by holding that "[t]o avoid a transfer under Section 549(a) a trustee need only demonstrate: (1) a post-petition transfer (2) of estate property (3) which was not authorized by the Bankruptcy Code or the court." <u>Id.</u> at 1258. It then went on to explain that "[l]est any confusion exist, Cohen may avoid and recover from Marathon the funds Debtor transferred to it . . . because Debtor was not authorized to transfer the funds to anyone post-petition without the permission of CapitalSource or the bankruptcy court." <u>Id.</u> at 1260.

---

<sup>9</sup>(...continued)
the Trustee's cause of action instead was merely voidable under §549 (and that the deadline for filing a §549 action had passed). The Court ruled that the transaction was void pursuant to §362(a)(3) and that §549 was not applicable. The Court then cited <u>Delco</u> merely as an example of the proper invocation of §549. By citing <u>Delco</u> in <u>Beery</u>, the Court did not intend to endorse the ultimate holding in <u>Delco</u>.

Case 10-01180-s    Doc 13    Filed 10/05/11    Entered 10/05/11 09:59:39 Page 24 of 32

Finally, in response to Marathon's argument that it had provided product to the estate in exchange for the funds, the court ruled that "a 'harmless' exception to a trustee's Section 549(a) avoiding powers does not exist." _Id._ at 1262 (footnote omitted). Finally the court overruled Marathon's argument that it was an innocent vendor dealing with the debtor in possession in good faith and in the ordinary course of business:

> Congress evidently did not intend to allow the use of cash collateral without the permission of the interested secured creditor or the bankruptcy court, even if used in the ordinary course of business.
>
> As to Marathon's status as an "innocent vendor," Sections 549(a) and 550(a) by their terms contain no reference to, let alone an actual defense based on, the transferee's status (vendor, purchaser, etc.) or upon its state of mind (innocent, culpable, etc.). . . . Congress knew how to create exceptions based on transferee's status and culpability. But it chose not to do so when it came to initial transferees of post-petition transfers of cash collateral. We will not create such exceptions in Congress's absence.

_Id._ at 1263 (citation omitted).

The primary dispute in _Delco_ was whether, in a summary judgment context, the trustee had shown that the funds paid to Marathon were cash collateral. The bulk of the parties' arguments, and of the court's decision, focused on this issue. _Id._ at 1259-62. The court held that the trustee had made the requisite showing, but perhaps because of the focus on that factual issue, the court and the parties seemed to have missed a major legal issue: was there any harm to the estate that gave the

Page -25-

trustee standing to bring the §549 action to begin with?  There is no mention whatever of that point in the opinion.  The <u>Delco</u> court specifically noted that Marathon argued that it had caused no harm, and seemingly accepted that argument.  <u>Id.</u> at 1262. Thus the issue of lack of harm to the estate and the question of standing arose.  But instead of making the leap to no harm, no foul[10], the panel ruled that there is no "harmless" exception to a trustee's section 549 avoiding power.  <u>Id.</u>[11]

In summary, the Court finds that Plaintiff Dill has not established (or even alleged) that the estate suffered an injury, and certainly not one from Brad Hall.  Nor can the Court fashion any remedy among the named parties that would redress any injuries that Plaintiff may have had.  In other words, the Court lacks jurisdiction and will dismiss the case, subject of course to the Trustee refiling in the event that he can assert that the estate suffered an actual economic loss.[12]

---

[10] Or better, "no harm, no standing, no case."

[11] <u>Delco</u> demonstrates an almost autonomic application of the statutes, without regard to the consequences.  For example, there is no discussion about whether the estate, having received almost $2,000,000 of product from Marathon, and then getting the $2,000,000 back, was not unjustly enriched.  Perhaps the court would have found that result also was not a reason to disregard what it regarded as the command of the statute, but one would have expected the parties to have argued the issue and the court to at least have addressed it.

[12] In ruling that the dismissal is without prejudice, the Court is not intending thereby to grant an extension to the
(continued...)

Case 10-01180-s   Doc 13   Filed 10/05/11   Entered 10/05/11 09:59:39 Page 26 of 32

**AFTERWORD**

The Court will not make alternative (and basically advisory) rulings on the present facts but will suggest at least some of the issues that may need to be addressed by the parties should the Trustee refile. The Court might need to consider that neither the Tenth Circuit nor the Tenth Circuit BAP have adopted a test of what constitutes an ordinary course of business transaction for purposes of section 363(c)(1)[13]. Many other circuits and courts have adopted two tests derived from three early Bankruptcy Code cases[14] that

_____

[12](...continued)
Trustee with respect to any limitations statute that the Trustee might be subject to. <u>See</u> §549(d):
> An action or proceeding under this section may not be commenced after the earlier of
> (1) two years after the date of the transfer sought to be avoided; or
> (2) the time the case is closed or dismissed.

[13] That section provides:
If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

[14] <u>See</u> <u>Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)</u>, 29 B.R. 391, 394 (S.D. N.Y. 1983):
The touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions
(continued...)

Page -27-

attempted to determine when something was ordinary course.  <u>See,</u>

<hr>

    [14](...continued)
    conducted are consistent with these expectations,
    creditors have no right to notice and hearing, because
    their objections to such transactions are likely to
    relate to the bankrupt's chapter 11 status, not the
    particular transactions themselves.

; <u>Johnston v. First Street Companies (In re Waterfront Companies,
Inc.)</u>, 56 B.R. 31, 34-35 (Bankr. D. Minn. 1985):

    [T]here are at least two dimensions to the concept of
    ordinary course of business. The defendants focus on
    one dimension which might be called the horizontal
    dimension. That is, we compare this debtor's business
    to other businesses and based on the kind of business
    it is in, we decide whether a type of transaction is in
    the course of that debtor's business or in the course
    of some other business. Thus raising a crop would not
    be in the ordinary course of business for a widget
    manufacturer because that is not a widget
    manufacturer's ordinary business.
        However there is another dimension which we could
    perhaps call the vertical dimension. Even though
    something is the type of transaction in which this
    debtor could be expected to take part, is it the type
    of transaction that is in the ordinary course of
    business? Some transactions either by their size,
    nature or both are not within the day-to-day operations
    of a business and are therefore extraordinary.

; and <u>Committee of Asbestos-Related Litigants and/or Creditors v.
Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 60 B.R. 612,
616 (Bankr. S.D. N.Y. 1986):

    [A] synthesis of existing caselaw reveals a developing
    yet workable analysis to be used in deciding whether an
    activity is within the debtor's "ordinary course of
    business." The analysis, using "vertical" and
    "horizontal" components, embodies the elastic
    rehabilitation policies of the Code yet respects its
    boundaries.

(Describing the vertical dimension test as examining the debtor's
transaction from the vantage point of a hypothetical creditor to
determine whether the transaction subjects that creditor to
economic risks of a nature different from those accepted when it
became a creditor.  And, describing the horizontal dimension test
as comparing this debtor's business to other like businesses to
determine if the transaction would be entered by the other like
businesses.)

e.g., Braunstein v. McCabe (In re TMG Holdings, LLC), 571 F.3d
108, 124 (1st Cir. 2009); In re Straightline Investments, Inc.,
525 F.3d 870, 879 (9th Cir. 2008); Medical Malpractice Ins.
Assoc. v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2nd Cir.
1997); In re Roth American, Inc., 975 F.2d 949, 953 (3rd Cir.
1992); In re Git-N-Go, Inc., 322 B.R. 164, 172 (Bankr. N.D. Okla.
2004); In re Podzemny, 2011 WL 576591 at *5 (Bankr. D. N.M.
2011).  If both tests are passed, the subject transaction is
deemed to be in the ordinary course of business.  Id.

     This Court imagines that no matter what test or tests the
Tenth Circuit ultimately embraces, the purchase of gasoline for
resale by a gas station/convenience store would be the
archetypical ordinary course of business transaction.  Plaintiff
argues, however, that the misuse of cash collateral causes the
ordinary course transaction to be, at the same time, not ordinary

course.[15]  The answer to this paradox awaits another day, when the Court has jurisdiction.

The Court might also need to discuss an apparent conflict between Sections 502(h) and 503.  Trustee's recovery avoided postpetition transfers through section 550.  Section 502(h) provides:

> A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

On the other hand, §503(b) provides that any actual, necessary costs and expenses of preserving the estate are administrative expenses entitled to priority treatment.  Can payment of an administrative expense be transformed into an unsecured

---

[15] This brings to mind the situation of Schrödinger's cat: One can even set up quite ridiculous cases.  A cat is penned up in a steel chamber, along with the following device (which must be secured against direct interference by the cat): in a Geiger counter, there is a tiny bit of radioactive substance, so small that perhaps in the course of the hour, one of the atoms decays, but also, with equal probability, perhaps none; if it happens, the counter tube discharges, and through a relay releases a hammer that shatters a small flask of hydrocyanic acid.  If one has left this entire system to itself for an hour, one would say that the cat still lives if meanwhile no atom has decayed.  The psi-function of the entire system would express this by having in it the **living and dead cat** (pardon the expression) mixed or smeared out in equal parts.
Schrödinger, Erwin. "Die gegenwärtige Situation in der Quantenmechanik (The present situation in quantum mechanics)". Naturwissenschaften. (November 1935) (Emphasis added.)

Case 10-01180-s   Doc 13   Filed 10/05/11   Entered 10/05/11 09:59:39 Page 30 of 32

prepetition claim if paid with an unauthorized use of cash collateral which payment is recovered for the estate?

Next, the Court might consider what would become of any funds recovered through section 550. Would the cash collateral creditor seek to claim them as proceeds of its collateral? Would it be fair for that the creditor to keep the proceeds of the sold gasoline and then receive the money used to pay for the gasoline? Alternatively, would the trustee claim that the funds were free of liens? Would it be fair for the estate to receive a windfall of $97,860.01 created by the Debtor's violation of a court order?

And, finally, the Court might note that a key policy of Chapter 11 is to encourage vendors to do business with the debtor to enable a successful reorganization. Awarding a judgment against a good-faith vendor (certainly one without notice of the end of cash collateral authority) of a Chapter 11 debtor might seriously discourage future vendors from doing business with debtors in possession. On the other hand, the <u>Delco</u> court makes a strong textual argument that there is no exception in §549 for such policy considerations.

Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket: October 5, 2011

Copies to:

James A Askew
Arland & Associates, LLC
201 3rd ST NW, STE 505
Albuquerque, NM 87102-3331

Victor E Carlin
Moses Law Firm
PO Box 27047
612 First Street, NW
Albuquerque, NM 87125-7047

Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608